Judge Zilly

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| OUR MONEY OUR TRANSIT and ROBERT MACHERIONE,<br><br>                     Plaintiff,<br><br>      v.<br><br>FEDERAL TRANSIT ADMINISTRATION; PETER M. ROGOFF, in his official capacity as Administrator, Federal Transit Administration; and RICHARD F. KROCHALIS, in his official capacity as Regional Administrator, Federal Transit Administration Region X Office,<br><br>                   Defendants,<br><br>LANE TRANSIT DISTRICT,<br><br>                   Intervenor. | CASE NO. C13-1004TSZ<br><br>**FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 1
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

# INTRODUCTION

Defendants Federal Transit Administration, Peter M. Rogoff, and Richard F. Krochalis (hereafter collectively referred to as "the FTA") submit this memorandum in opposition to Plaintiffs' motion for summary judgment and in support of their cross-motion for summary judgment.

The source of the dispute is a proposal by Intervenor Lane Transit District ("LTD") to undertake an extension of its existing bus rapid transit system to connect that system to presently unserved areas of Eugene, Oregon and Springfield, Oregon. Because LTD has applied for, and proposes to partially fund this project with federal funds administered by the FTA under its "Small Starts" program, FTA's obligations under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4332, *et. seq.,* are implicated. Broadly speaking, NEPA requires, in the case of a "major Federal action[ ] significantly affecting the quality of the human environment," that the responsible agency prepare a detailed statement (commonly known as an "environmental impact statement" or "EIS"). *Id.* The purpose of an EIS is to inform the public and to make information available to an agency decision-maker about the significant environmental consequences associated with a contemplated agency action at a meaningful point in time so that the decision is an informed one from an environmental perspective. However, while NEPA is "action-forcing," it is not outcome-determinative. It only requires that information as to significant environmental impacts associated with a project be available to the federal decision-maker, but it does not require that the decision-maker choose, the "best," or even the most environmentally benign option. In other words, NEPA is intended to prevent "uninformed" rather than "unwise" agency action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

Conversely, where the responsible agency determines on the basis of an "environmental assessment" ("EA") that a project as proposed will not significantly affect the quality of the human environment, the responsible agency may issue a "Finding of No Significant Impact," otherwise more commonly known as a "FONSI," (pronounced "fawn-see.") and thereby discharge its obligations under NEPA. Thus, the purpose of an EA under NEPA is quite different from that of an EIS. Its purpose is not to amass and disclose all possible details regarding a proposal. Rather, an EA should stand as a "workable public document that briefly provides evidence and analysis for an

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 2
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

agency's finding regarding an environmental impact." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012). The law does not require an agency in an EA "to compile an exhaustive examination of each and every tangential event that potentially could impact the local environment [because s]uch a task is impossible, and never-ending." *Id.* at 1053. An EA must only "provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Development v. U.S. Army Corps of Engineers*, 524 F.3d 938, 947 (9th Cir.2008).

Plaintiffs' claim, like all NEPA claims, rests upon Section 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704. In substance, Plaintiffs argue that the FTA's December 20, 2012, Finding of No Significant Impact ("FONSI") in regards to the West Eugene EmX Extension Project proposed by LTD was a "final agency action" which was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of Section 10(e)(B)(1) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because it is based on a flawed EA. Accordingly, they ask the Court to set aside the FONSI and enjoin the West Eugene EmX project from moving forward.[1]

Plaintiffs commence their argument with a relatively straightforward engineering principle, *i.e.*, "the shortest distance between two points is a straight line." Dkt. # 29, p. 5, *ll.* 5-6. Perhaps so, but that Plaintiffs choose to lead off their argument with such an observation is emblematic of a problem which is rife throughout their memorandum. To be clear, NEPA is concerned wholly and exclusively with *environmental impacts*. Whether the route of a proposed project runs in a straight line, or not, is a matter of concern under NEPA only if the difference between the two results in an environmental consequence of significance. Indeed, a straight line route is not necessarily a superior route when viewed through the prism of NEPA. A straight line route might well breach wetlands while a less direct route might avoid them. This disconnect is evident in many, if not all, of

---

1 As drafted, Plaintiffs' complaint also asked the Court to separately review aspects of the FTA's grant procedure under its "Small Starts" program. Dkt. # 1, p. 18, *ll.* 1-19. Plaintiffs have voluntarily dismissed that particular claim (Count II of their complaint) without prejudice. Dkt. # 18.

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 3 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

Plaintiffs' arguments.

In regards to the West Eugene EmX Project, local agencies, not the FTA, are primarily responsible for the planning, designing, engineering, and ultimately operating the project they hope to develop. The FTA, on the other hand, administers federal funds pursuant to the New Starts/Small Starts program, 49 U.S.C § 5309, which might be expended on the West Eugene EmX Project. Its decision to fund the project, or not, will be determined by an administrative process which is entirely separate from, but nevertheless *informed by*, the environmental analysis undertaken pursuant to NEPA. The purpose of its NEPA evaluation is only to identify and understand *significant* environmental impacts expected to arise from a project while it is at a relatively conceptual level (when the input will be the most useful and most meaningful). For that reason, operational issues are not relevant for NEPA purposes except insofar as they have environmental implications of significance. *See Citizens for Mobility, et al. v. Norman Mineta, etc., et al.*, Case No. C00-1812Z, *aff'd.,* 119 Fed.Appx. 882 (9th Cir. 2004) ("[S]ignificant operational changes need not result in significant environmental impacts, and it is environmental impacts, not operational changes *per se* (however significant they may be), that are the concern of NEPA."). Thus, absent an environmental impact of significance, it is not important for NEPA purposes whether an alternative routing option runs in a straighter line than another, or whether it might be viewed by some as "preferable" or "technically superior." Those concerns are vetted and resolved elsewhere. The only question before the Court here is whether Plaintiffs have carried their burden of demonstrating that the finding of no significant *environmental* impact in regards to the West Eugene EmX Project, as proposed, was "arbitrary and capricious." As set forth herein, Plaintiffs have failed to carry their burden.

## STANDARD OF REVIEW

The judicial review provisions of Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, *et seq*., provide the waiver of sovereign immunity for a claim which alleges that a final agency action was taken in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332. *North Idaho Community Action Network v. U.S. Department of Transportation*, 545 F.3d 1147, 1152 (9th Cir. 2008).[2] In such cases judicial review is ordinarily confined to the

2  General subject matter jurisdiction rests on 28 U.S.C. § 1331.

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 4 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

administrative record.  *San Luis & Delta Mendota Water Authority v. U.S.,* 672 F.3d 676, 713 (9th Cir. 2012).  The plaintiff's burden is to establish that a final agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of Section 10(e)(B)(1) of the APA, 5 U.S.C. § 706(2)(A).

This statutory language has been the subject of much judicial construction.  A "heavy burden" is imposed upon a petitioner seeking to overturn a final agency action as "arbitrary and capricious."  *Short Haul Survival Committee v. United States*, 572 F.2d 240, 244 (9th Cir. 1978) (citations omitted).  It is well-established that an agency's decision is entitled to substantial deference, and the validity of its decision is presumed.  *Center For Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009).  Under this standard, decisions of federal agencies cannot be vacated unless the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it would not be ascribed to a difference in view or the product of agency expertise."  *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (internal quotations omitted), *and see, Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Department of Agriculture*, 415 F.3d 1078, 1093 (9th Cir. 2005).   It is the *legality* of an administrative decision, not its wisdom or prudence, which is the subject of judicial review under the APA.  *See, River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  Thus, it is frequently said in decisions applying this standard that federal courts are not empowered to "second guess" or substitute their judgment for that of the agency.  *See, e.g., Alcoa, Inc. v. Bonneville Power Administration*, 698 F.3d 774, 788 (9th Cir. 2012); *and see, Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 105 (1983) (a federal court assesses only whether the agency's decision is "within the bounds of reasoned decision making" and not whether it would have made the same decision or whether it thinks the decision is a wise one).

At its core, Plaintiffs' lawsuit seeks judicial review of the FTA's FONSI which, in turn, is based on an environmental assessment (EA).  Under NEPA, an agency need not complete an EIS for a particular proposal if it finds, on the basis of a shorter EA, that the proposed action will not have a

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 5 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

significant impact on the environment.  40 C.F.R. §§ 1508.9(a), 1508.13.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S.Ct. 2743, 2750 (2010).  The EA is to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]."  *Department of Transportation v. Public Citizen*, 541 U.S. 752, 757-758 (2004) (quoting 40 C.F.R. § 1508.9(a)).  If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a "finding of no significant impact" (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment.  *Id.* (citing 40 C.F.R. §§ 1501.4(e), 1508.13).  "An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).  Plaintiffs' burden is to show that "substantial questions are raised" as to whether a project may cause "significant degradation of some human environmental factor."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  However, a plaintiff cannot satisfy this burden simply by cherry picking information and data out of the administrative record to support its position. *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1240 (9th Cir. 2005).  Rather, the Court's review is guided by a "rule of reason."  *Public Citizen*, 541 U.S. at 767-768 ("[w]here the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS.")  Once the Court is satisfied that a federal agency took the necessary "hard look" at the environmental consequences of a proposed action, its review is "at an end." *Defenders of Wildlife v. Ballard*, 73 F.Supp.2d 1094, 1102 (D. Ariz. 1999).

## STATEMENT OF FACTS

The project which is the subject of this lawsuit is known as the West Eugene Emerald Express ("West Eugene EmX").  It is an extension of LTD's two existing bus rapid transit systems in Eugene and Springfield, Oregon, known respectively as the "Franklin EmX" and the "Gateway EmX." AR0118825.  "Bus rapid transit" ("BRT") uses buses to emulate the reliability of service and convenience of light rail transit without the high cost of light rail transit.  AR0118822-0118823.  It accomplishes this through the flexibility of being able to utilize different roadways (exclusive bus

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 6
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

lanes, expressways or ordinary streets), by providing fewer stops and more frequent service, and by taking advantage of transit priority systems such as traffic signal priority. AR0118822; AR0052649; AR0052654.

The West Eugene EmX will extend the east-west Franklin EmX bus rapid transit service west for approximately 4.2 miles. In total, and measured as a round trip, West Eugene EmX is an 8.8-mile alignment which is routed predominantly over existing public right-of-way. AR0119063. The project, which is designed to have minimal impacts to adjacent property by using existing right-of-way as much as possible, contemplates partial real property acquisitions of only 2.5 acres, approximately, from non-Government owners, consisting of small amounts of land along the edges of the properties. AR0118834. Possible full-property acquisitions will be limited to "remnant parcels" owned by the State of Oregon, totaling 0.07 acres of land. *Id.*; *see generally* AR0118915. There will be only two business displacements and one residential displacement consisting of a unit in a former motel which now has uncertain legal status. AR0118834.

The project's Purpose and Need statement and the build alternative selected for review in the EA were developed through a lengthy and detailed public transportation planning process which involved a considerable amount of government agency and public involvement. Indeed, when the FTA issued its Notice of Intent to prepare an environmental impact statement in 2007, local planning for this project had already been ongoing for more than a decade. AR0052654. Discussions about new transportation options began in the early 1990s as part of a regional transportation plan update. During the update process, several transit options were considered, analyzed, and discussed in public forums. AR0052654. From two key transportation studies which were completed during this period, the "Urban Rail Feasibility Study" (1995), AR0000324-AR0000421, and "Major Investment Study"(1999), AR0000260-0000305, by the Lane Council of Governments (LCOG), the Eugene-Springfield Metropolitan Planning Organization (MPO) and LTD, "bus rapid transit" emerged as the "clearly preferred transit strategy." AR0052654. Among the recommendations of the 1995 study was that the region implement policies which would "improve bus services to rapid transit standards in major corridors." AR0000338. The 1999 Major Investment Study (MIS) sponsored by the LCOG, the MPO, Oregon Department of Transportation, the Cities of Eugene and Springfield, Lane

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 7
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

County, LTD and the Federal Highway Administration (FHWA), provided the rationale for advancing bus rapid transit as the high capacity transit mode for the area. The MIS found, among other things, that a bus rapid transit system would adequately address project goals, but at the same time, would cost substantially less than urban rail concepts. AR0000302-AR0000303. Current cost estimates for both light rail and BRT systems suggest that light rail capital costs are in a range of 5 to 10 more than the cost of a similarly configured BRT system. AR0052657. As a result, BRT was approved in 2001as a key element of the new transportation plan (TransPlan) adopted by Eugene, Springfield, Lane County, and LTD. AR0052654.

This Regional Transportation Plan identified a comprehensive 61-mile long system of bus rapid transit corridors. AR0052658. The first bus rapid transit corridor to be constructed was the 4-mile Franklin line linking downtown Eugene with downtown Springfield. Service began in January 2007. AR0052659. The second bus rapid transit corridor to be constructed was the Gateway extension opened in January 2011. AR0052660. This 7.8-mile route extended bus rapid transit service from downtown Springfield to the popular Gateway area, providing service to the Gateway Mall, Sacred Heart Medical Center and International Way businesses. *Id*. In January 2007, recognizing traffic and transit problems in West Eugene, the City of Eugene and LTD selected the West Eugene area for bus rapid transit's next corridor study. AR0052660-0052661.

The West Eugene transit corridor generally consists of transit travel between downtown Eugene and Green Hill Road which has also been referred to as the "West 11th Avenue Corridor." AR0052660. Following the publication of a Notice of Intent, and through engineering refinements, agency consultation, and public feedback about the potential impacts associated with various alternatives, the range of alternatives were narrowed to some 56 unique routing combinations under four bus rapid transit alternatives. AR0117966. In early 2010, LTD conducted technical impact studies on "No-Build," Transportation System Management ("TSM"), and two bus rapid transit alternatives on 56 unique routes.[3] These technical impact studies analyzed the impacts of these 56-build routes in the following areas:

- Protected (and concerned) species and their habitats;

---

3 See footnote 8, *infra*, regarding the Transportation System Management ("TSM") alternative.

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 8
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

1 • Wetlands;
• Stormwater runoff and required land for mitigation and treatment;
2 • Capital cost versus relative projected ridership;
• Increased channelization of Amazon Creek
3 • Multi-use trails
• Disruption of low income housing;
• Cultural resources
4

5 AR0117966-0117967. In June 2010, based on a variety of technical studies, evaluation criteria

6 developed from the project's purpose and need statement, LTD staff recommendations, public input,

7 and advice from the Eugene City Council, LTD eliminated 46 unique BRT routing combinations

8 (associated with the two BRT Alternatives) from further study, reducing the number of alternatives

9 and design options under consideration to the No-Build, TSM and three BRT Alternatives (with

10 design options). AR0052661. From there, 12 alternatives were assessed under 17 measures of

11 effectiveness associated with eight evaluation criteria developed from the project's purpose and need

12 statement and against federal criteria used in the FTA's Small Starts capital funding program.

13 AR0053380-0053381. Evaluation results were included in the draft Alternatives Analysis Report

14 and made available for public and agency review and comments from 2010-2011. AR0053382.

15 During this entire period of availability (2010-2011) and up until the time of publication of the Final

16 Alternatives Analysis Report in July 2011, there were numerous open public meetings and agency

17 outreach efforts. *Id*. In August 2011, as reflected in the Locally Preferred Alternative Report, the

18 West 11th Ave. Corridor was selected as the build alternative to be brought forward for study in the

19 EA by three separate decision-making bodies: the Eugene City Council on March 9, 2011, the LTD

20 Board on March 16, 2011, and the Metropolitan Policy Committee on April 14, 2011. AR0053386.

21 Based on the extensive scoping process at the very early planning stages of this project, the

22 detailed technical evaluations of the many alternatives and variations considered, the extensive

23 public and agency outreach, as reflected in the draft Alternatives Analysis Report, and the

24 endorsement of the West 11th Ave. Corridor as the "locally preferred alternative" (LPA) by the

25 three local stakeholders, as noted above, the FTA concurred that a NEPA environmental review

26 process that began in 2007 contemplating the preparation of an environmental impact statement

27 (EIS) could instead move forward as an environmental assessment (EA) process. In particular, FTA

28 noted as follows:

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 9
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

LTD has presented to FTA that the preliminary LPA has evolved from the original proposal in some important ways and incorporates a number of design elements to avoid significant impacts to the natural and built environment. Among these elements, based on design work performed to date:

• The LPA ends some two miles east of the original terminus at Green Hill Road, thereby avoiding serious issues with wetlands, endangered species, and recreation/parklands.
• It avoids the Amazon Creek and adjacent trail except for at one existing roadway crossing.
• It avoids street improvements that would have used property from several historic properties along the corridor.
• It has reduced substantially the number of parking spots that would be eliminated as a result of the project.
• It appears to require much less property acquisition (and only one privately-owned parcel in its entirety) than what was anticipated.
• It appears to avoid adverse impacts to established residential neighborhoods.
• It affects far fewer street and landscape trees than the early alternatives that were developed.

AR0114557.

The environmental assessment for the West Eugene EmX Extension Project was published in July 2012. AR0118801-0119178. As identified in the EA, the purpose of the project is:

to implement high-capacity public transportation service, in the West 11th Corridor (east/west), utilizing the adopted high-capacity transit mode identified in the Regional Transportation Plan, that is less hindered by congestion and that provides efficient, effective, dependable, and visually appealing service throughout the life of the project.

AR011852. Upon its independent evaluation of the EA, the FTA issued its FONSI on December 20, 2012. AR0115152-0115320. It concluded:

After carefully reviewing the EA and supporting documents, including comments from the public and agencies and the responses made to those comments, FTA finds under 23 C.F.R. § 771.121 that the proposed project, with the mitigation that is required herein, will have no significant adverse impact on the environment. The record provides sufficient evidence and analysis for determining that an Environmental Impact Statement is not required.

AR0115163.[4]

**ARGUMENT**

I. <u>ALTERNATIVES WERE NOT INADEQUATELY CONSIDERED</u>

According to Plaintiffs, the EA is necessarily defective because of the existence of a "viable but examined alternative." The "viable alternative" of which Plaintiffs speak would route the

---

4 This is the relevant finding for purposes of Plaintiffs' claim. The FONSI contains a host of other findings made by the FTA Regional Administrator under others statutes and authorities. With the exception of a finding regarding "environmental justice," the validity of these findings have not been challenged by Plaintiffs in this lawsuit and therefore are presumptively valid.

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 10 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

West Eugene EmX project along different streets in Eugene, *i.e.*, West 13th-West 11th Avenues, where the locally preferred alternative instead, for a few blocks, uses West 6th-West 7th Avenues. According to Plaintiffs' memorandum (without any attribution to the administrative record) their preferred route is "technically and environmentally superior." Dkt. # 29, p. 14, *ll*. 8-10. They say that the EA's failure to analyze their preferred route necessarily means that the EA is "inadequate" because, according to their argument, "'[t]he existence of a **viable but unexamined alternative** renders an EA **inadequate**.'" Dkt. # 29, p. 10, *ll*. 23-26 (*citing Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013)) (emphasis in original). This argument depends on a literal interpretation of an unfortunate catchphrase which has found its way into many Ninth Circuit decisions, but which does not accurately represent the state of NEPA law as it has existed since at least 1978 in the wake of the Supreme Court's seminal decision in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978). The simple premise which Plaintiffs would have this Court accept as gospel is that every "viable alternative" must be analyzed in an EA or the EA is, by definition, inadequate. Plaintiffs can only make this argument by ignoring the vast amount of precedent which makes this premise untenable . It has been rejected as the law for a very practical reason: the number of possible alternatives, and variations to alternatives, for a project like this is seemingly infinite. Consequently, under the law as Plaintiffs imagine it, NEPA compliance would be not just a wasteful exercise but a virtual impossibility as harried public officials would have to try to anticipate, and evaluate, myriad conceivable alternatives and variations of alternatives no matter how indistinct they might be from an environmental perspective. The process of preparing an EA or an EIS would be reduced to a grand paper chase, followed by the inevitable after-the-fact lawsuits in which clever litigants, and their even more clever attorneys, could and would imagine more alternatives or variations of alternatives not anticipated by these public officials.

Early on in NEPA's existence the Supreme Court was called upon to address such an argument in the context of an EIS. Recognizing the futility of such an approach, the Court observed that "[c]ommon sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 11 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551 (1978).   One need not go too far out on a limb to recognize that a literal interpretation of the catchphrase relied upon by Plaintiffs (particularly in the context of an EA, which, unlike an EIS, does not require a "detailed statement of alternatives") cannot coexist with *Vermont Yankee*.[5]  Indeed, this is reflected in the development of the case law, both as to EAs and EISs.

In regards to an *EIS*, it is now well-settled that NEPA requires only that an agency consider a reasonably full range of alternatives.  *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985) (emphasis added); see also 42 U.S.C. § 4332(2)(c)(iii).  The adequacy of the range of alternatives evaluated in an EIS is reviewed under a "rule of reason" standard which requires that an agency "set forth only those alternatives necessary to permit a reasoned choice."  *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) ("the touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision making and informed public participation").  As a result, an agency's consideration of alternatives in an EIS is sufficient "if it considers an appropriate range of alternatives, *even if it does not consider every available alternative.*"  *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1181 (9th Cir. 1990) (emphasis added); *and see*, *Building A Better Bellevue v. U.S. Dept. of Transportation*, 2013 WL 86584382, *2 (W.D. Wash. 2013); *Coalition for a Sustainable 520 v. U.S. Department of*

---

5  The catchphrase relied upon by Plaintiffs is traceable to a single case, *Brooks v. Coleman*, 518 F.2d 17 (9th Cir. 1975), which was decided three years before the Supreme Court announced its decision in *Vermont Yankee*.  Ironically, the *Brooks* Court correctly anticipated the holding in *Vermont Yankee* by ruling that an EIS for a highway viaduct near Snoqualmie Pass was not defective for failing to consider a different design proposal as a separate alternative.  The Court said:

> We think the final EIS adequately described the viaduct alternatives.  The EIS "need only set forth those alternatives 'sufficient to permit a reasoned choice'." . . . When the alternatives are thus set forth, an EIS does not become vulnerable because it fails to consider in detail each and every conceivable variation of the alternatives stated.  The district court concluded, and we agree, that the German viaduct design was simply a variant of the viaduct-type alternatives that were adequately described in the final EIS.

*Id.* at 19 (emphasis added).  Unfortunately, *Brooks* was miscited in subsequent decisions.  Far from the unconditional version of this catchphrase relied upon by Plaintiffs, the actual holding in *Brooks* was that "[t]he existence of an unexamined but viable alternative to the adopted plan . . .  *could* render the environmental impact statement inadequate . . ."  *Id.* at 18-19. (emphasis added.)  Unfortunately, the original mischaracterization of the holding in *Brooks* has simply been parroted in subsequent cases leading to something of a disconnect between this catchphrase as it emerged after *Brooks* and the actual state of the law.

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 12 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

*Transportation*, 2012 WL 3059404 *11 (W.D. Wash. 2012).

Less rigorous rules apply to an EA. In *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1323 (9th Cir. 2005), the Court discussed at length a federal agency's obligations *vis a vis* the NEPA alternatives requirement in regards to an EA. The Court said:

> [W]e join our sister circuits in holding that an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS. In rejecting any alternatives, the agency must only include "brief discussions of the need for the proposal, of alternatives required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."

*Id*. at 1426 (citations omitted).

Plaintiffs' argument deems the EA to be inadequate because, referring to the West 13th-West 11th Avenues Route, "this technically and environmentally superior route was **not considered at all** as an alternative in the EA, nor was any explanation for its omission given." Dkt. # 29, p. 10, *ll*. 8-10.[6] It simply is not possible to say that the West 13th-West 11th Avenues Route was not

---

[6] Plaintiffs offer no support in the administrative record at all for their representation that the West 13th-West 11th Avenues Route was an "environmentally superior route." *At best*, one might feasibly argue that the Walker report upon which they rely supports an argument that the West 13th-West 11th Avenues Route is *technically superior* because it follows a straight path. The essence of Mr. Walker's opinion is as follows:

> In the end, the core problem with the proposed alignment 6th/7th is that it is obviously circuitous, in a way that great transit lines are not. It will always look and feel compromised in a way that may undermine its ability to build developer confidence as a permanent and structure [sic] piece of civic infrastructure. The bypass of inner West 11th will look perpetually awkward, much like the way the Washington DC Metro bypasses Georgetown due to long-ago and now-regretted objections. Eventually, it will be necessary to add this segment back, possibly in the context of extending 6th/7th infrastructure into a new EmX corridor such as River Road or Highway 99. Still, it would be better to create a line that does not need to be "fixed" in the future.

> Should the EmX segment east of Garfield be returned to West 11th or West 11th/13th? Obviously this would reopen a major debate, but it may turn out that 6th/7th has simply discarded too many of the project's benefits, as well as raising controversy of its own.

> Given this reality, one could make a strong argument that if controversy is inevitable anyway, the City should fight the battle that will deliver a strong, direct, uncompromised transit line that can form a crucial piece of long-term infrastructure. That corridor would clearly be West 11 or West 11th/13th.

AR0079548. Missing from Mr. Walker's report is anything from which one could draw the conclusion that Mr. Walker believes that the West 13th-West 11th Avenues Route is "environmentally superior." It is not even clear that Mr. Walker would have sufficient credentials to meaningfully draw such a conclusion if he had. And, even if he had drawn such a conclusion, it would be legally irrelevant to this Court's inquiry. *See Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994) (*quoting, Sabine River Auth. v. United States Dep't of Interior*, 745 F. Supp. 388, 399 (E.D.Tex.1990) (internal quotation marks omitted), aff'd, 951 F.2d 669 (5th Cir.), *cert. denied*, 506 U.S. 823 (1992)) ( "Although consideration of some range of alternatives is essential to any environmental assessment, it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway."), *accord Earth Island Institute v. U.S. Forest Service*, 697 F.3d 1010, 1023 (9th Cir. 2012).

---

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 13 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

considered at all. Indeed, not only was it considered, but one of its two variations was actually

ranked highest out of all alternatives, and the other variation was ranked second. AR0053036.

However, these superior rankings were not based on environmental superiority. Rather, as set forth

in the Alternatives Analysis Report, "[t]his total rating is largely due to operating and cost

efficiencies, higher safety and mobility, and better support of land use plans and the BRT System

Plan. *Id.* As a preliminary matter, the project team recommended the West 13th-West 11th Avenues

Alignment Alternative be selected as the LPA, AR0053382, and many other groups supported this

alignment, AR0053385-0053386. However, all of the three relevant decision-making bodies, the

Metropolitan Policy Committee, the Eugene City Council, and the LTD Board of Directors, after

conducting their own public processes and after receiving a considerable amount of public input,

selected the West 6th/7th Avenues Route. AR0053386. As summarized in the EA:

> In May 2011, after significant public input, the three decision-making bodies eliminated the
> remaining West 13th Alternative and mitigation concepts and selected an LPA for the West
> 11th Avenue Corridor, as described in more detail in Section 2.2.2.

AR00118869.

    In summary, Plaintiffs are simply incorrect in asserting that the West 13th-West 11th

Avenues route option did not receive consideration in the EA process. It clearly and demonstrably

received full and meaningful consideration, and at a preliminary stage was in the lead among the

proposals under consideration from a technical perspective. Unfortunately for Plaintiffs, after this

proposal was publically vetted, it was not the LPA chosen by the relevant decision-making bodies.

    Plaintiffs regard it as "astounding" that the potential environmental effects of the West 13th-

West 11th Avenues route were not evaluated in the EA. Dkt. # 29, p. 11, *ll.* 3-7. That would have

been wasted effort simply because it would serve no purpose and, more importantly, is not required

by NEPA. The EA already identifies an alternative which it has properly determined will have no

significant environmental impacts. The FTA has no obligation thereafter to consider other

alternatives (or in this case, a variation), even if those other alternative are believed to be "more

environmentally sound" by project opponents. *See Earth Island Institute v. U.S. Forest Service*,

697 F.3d 1010, 1023 (9th Cir. 2012) (citing *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)).

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 14
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

## II.  THE PURPOSE AND NEED STATEMENT DID NOT VIOLATE NEPA

Plaintiffs argue that the statement of the purpose and need for the project, as set forth in the EA was "too narrow."  This argument misperceives the FTA's role in evaluating the environmental impacts of a locally proposed project under NEPA while simply ignoring the long history of the project's development.[7]  Despite decades of open and public processes that narrowed the potential modes by which the transportation needs of the local community could be best met, Plaintiffs now complain that the EA should have considered alternatives to bus rapid transit.  Specifically, Plaintiffs support the so-called Transportation System Management (TSM) alternative, which examined whether and how the community's needs could be met simply by enhancing regular existing bus service without making infrastructure improvements.[8]  Dkt. # 29, p. 15, *ll.* 11-20.  But the TSM alternative was consciously not carried forward by the Joint LPA Committee "because it did not meet the purpose of the project and because of its relatively high operating cost per trip."  AR0118868.

In evaluating a project's purpose and need statement, the Court should uphold an agency's definition of project objectives "so long as the objectives that the agency chooses are reasonable."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).[9]  Further, an agency

---

7 A similar misperception underlies Plaintiffs' argument that the West Eugene EmX is not "needed."  Dkt. # 29, p. 16, *l.* 18 – p. 17, *l.* 18.  Whether the projected is "needed" in an absolute sense is simply not a relevant inquiry under NEPA. Local transportation planning agencies have determined that the project is necessary, and it is not federal defendants' role under NEPA to second-guess their decision.  NEPA is only concerned with environmental impacts.  *See Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1466 (9th Cir.1996).  Neither of the cases cited by Plaintiffs, *Chelsea Neighborhood Associations v. U.S. Postal Service*, 516 F.2d 378 (2nd Cir. 1975) and *Natural Resources Defense Council v. Hughes,* 437 F. Supp. 981 (D.D.C. 1977), stand for a contrary proposition.  In both cases, the discussion of the required "no action alternative" in EISs prepared by the agency defendants was found to be inadequate.  The purpose of the "no action alternative" in NEPA is not to provide a basis for determining the substantive merit of a given project. Rather, it is only to provide a basis to "compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo."  *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1039-1040 (10th Cir. 2001).  Plaintiffs identify no defects in the EA's discussion of the no action alternative.  It must therefore be presumed to be adequate.

8 This Court has addressed the TSM alternative concept in the context of a NEPA lawsuit before.  As the Court recognized in *Citizens for Mobility, et al. v. Norman Mineta, etc., et al.*, Case No. C00-1812Z, *aff'd.*, 119 Fed.Appx. 882 (9th  Cir. 2004), consideration of a TSM alternative is an FTA requirement relating to applications for federal funding for major capital investment projects which is unrelated to NEPA.  *Id.* at p. 23, *ll.* 3-24.

9 As the Court indicated:

An agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate alternative ways of achieving its goals, shaped by the application at issue and by the function that the agency plays in the decisional process. Congress did expect agencies to consider an applicant's wants when the agency formulates

---

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 15 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

is not required to study alternatives that do not meet the project's purpose and need. *See City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved."); *City of Carmel-by-the Sea v. U.S. Department of Transportation*, 123 F.3d 1142, 1155 (9th Cir. 1997) (project's goal necessarily dictates range of reasonable alternatives).

The purpose of the West Eugene EmX project is to "implement high-capacity public transportation service, in the West 11th Corridor (east/west), utilizing the adopted high-capacity transit mode identified in the Regional Transportation Plan . . ." AR0118850. That mode was Bus Rapid Transit. AR0052654. This is a reasonable objective, as it resulted from years of planning studies, alternatives analysis, and environmental review by state and local authorities and involved a high degree of public input. AR0118715-AR0118720 ("Locally Preferred Alternative Report").

Where as here, the local transportation planning authorities have, through years of transportation planning studies and deliberations settled upon bus rapid transit as the transportation mode by which they wish to meet their goals and objectives, NEPA does not require the FTA to evaluate other methods and means by which the project proponent might meet these objectives. Rather, in defining the objectives of a project, "the agency should take into account the needs and goals of the parties involved in the application." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195-196 (D.C. Cir. 1991). Indeed, it is fully within the contemplation of NEPA that the FTA will rely on a local proponent's lengthy local planning process to craft the purpose and need statement, and to have done so here was not arbitrary and capricious. *See Sierra Club v. U.S Department of Transportation*, 310 F.Supp.2d 1168, 1193 (D. Nev. 2004 ) (quoting 40 C.F.R. § 1506.2(b) and noting that "CEQ regulations mandate federal and state cooperation 'to the fullest extent possible …"). Linking local transportation planning with the NEPA process is specifically authorized by the NEPA regulations under which the FTA operates, *see* 23 C.F.R. § 450.212[10], and

the goals of its own proposed action. *Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be.*

*Citizens Against Burlington, supra*, 938 F.2d at 199 (emphasis added).

10 23 C.F.R. § 450.212, provides, in pertinent part:

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 16 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

encouraged by agency guidance.[11]  Very recently, the Court of Appeals reiterated that it is both proper and appropriate under NEPA for federal agencies to rely on prior local analysis in its consideration of alternatives.  *See HonoluluTraffic.com v. Federal Transit Administration,*___ F.3d ___, 2014 WL 607320, **5-6 (9th Cir. 2014) ("We have held, however, that an agency does not violate NEPA by refusing to discuss alternatives already rejected in prior state studies.") (citing, *Laguna Greenbelt, Inc. v. U.S. Department of Transportation*, 42 F.3d 517 , 524 n.6 (9th Cir. 1994)); *Sierra Club*, *supra*, 310 F. Supp. 2d at 1193 ("FHWA's decision not to duplicate the state agencies' analyses and evaluations as to what alternatives would be feasible and meet project goals does not violate NEPA.").  Applying these rules, this District, in *Building A Better Bellevue v. U.S. Department Of Transportation*, 2013 WL 865843 (W.D. Wash. 2013), rejected an argument that a purpose and need statement in an EIS was "too narrow" because it excluded consideration of high-capacity transit modes other than light rail to meet the needs of the Eastside.  *Id*. at *5.  Characterizing the argument as "a non-starter," the Court noted that "[t]he choice of light rail over bus service was the result of years of analysis and deliberation."  *Id*.  Thus, the Court concluded that the decision to confine the purpose of the project to expanding the light rail system was anything but

---

(a) Pursuant to section 1308 of the Transportation Equity Act for the 21st Century, TEA–21 (Pub.L. 105–178), a State(s), MPO(s), or public transportation operator(s) may undertake a multimodal, systems-level corridor or subarea planning study as part of the statewide transportation planning process. To the extent practicable, development of these transportation planning studies shall involve consultation with, or joint efforts among, the State(s), MPO(s), and/or public transportation operator(s). The results or decisions of these transportation planning studies may be used as part of the overall project development process consistent with the National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. 4321 et seq.) and associated implementing regulations (23 CFR part 771 and 40 CFR parts 1500–1508). *Specifically, these corridor or subarea studies may result in producing any of the following for a proposed transportation project:*

*(1) Purpose and need or goals and objective statement(s);*

(2) General travel corridor and/or general mode(s) definition (e.g., highway, transit, or a highway/transit combination);

(3) Preliminary screening of alternatives and elimination of unreasonable alternatives;

(4) Basic description of the environmental setting; and/or

(5) Preliminary identification of environmental impacts and environmental mitigation.

(emphasis added).

11 See Appendix A to 23 CFR Part 450, "Linking the Transportation Planning and NEPA Processes," (noting that the local transportation planning process "is the primary source of the project purpose and need" statement for NEPA review).

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 17 (Case No. C13-1004TSZ)

arbitrary because "it was the result of a long, careful, and deliberative process, and the light rail-specific purpose responds precisely to the transportation problems that needed to be solved." *Id*. at *6 (*citing*, 23 C.F.R. § 450.212(a)(1)).

As applied to this case, where the elaborate planning efforts of state and local transportation officials have come to focus on the expansion of the existing bus rapid transit system as the best way to address the particular transportation needs of their community, it makes little sense in an EA to study the environmental impacts of alternatives rejected by State and local planning authorities in an elaborate public process as not meeting the specific needs of their community. *See, City of Angoon v. Hodel*, 803 F.2d 1016 (9th Cir. 1986). This is particularly true here where the locally preferred alternative is properly found to have no significant environmental impacts.

III. <u>MITIGATION MEASURES ARE ADEQUATELY DISCUSSED IN THE EA</u>

Plaintiffs assert that "[a]n EA must demonstrate that the proposed mitigation provides an 'adequate buffer' against the negative impacts of the plan, and that the mitigation is concrete and enforceable." Dkt. 29, p. 19, *ll*. 10-12 (*citing, National Parks & Conservation Ass'n v. Babbitt* 241 F.3d 722, 735 (9th Cir. 2001), *abrogated in part by Monsanto Co. v. Geertson Seed Farms*, ___ U.S. ____, 130 S.Ct. 2743, 2757 (2010)). This argument is not supported by the applicable case law. Nowhere in *National Parks* do the words "concrete" and "enforceable" appear in regards to the discussion of mitigation measures in an EA. To the contrary, the applicable case law is precisely to the contrary. For example, in *National Parks & Conservation Association v. U.S. Department of Transportation*, 222 F.3d 677 (9th Cir. 2000), the Court said in regards to an EIS that "a mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *Id*. at 681 n.4.[12]

NEPA requires only a "reasonably complete discussion of possible mitigation measures" but not that a "detailed mitigation plan" be prepared. *Robertson v. Methow Valley Citizens Council*,

_____

12 It is also important to recognize that the *National Parks* case relied upon by plaintiffs is unlike the present lawsuit. In *that National Parks* case, the significance of impacts from increased cruise ship traffic in Glacier Bay was unknown and the NPS proposed to mitigate those impacts with uncertain measures of uncertain effectiveness. *See, Environmental Protection Information Center v. United States Forest Service*, 451 F.3d 1005, 1015 (9th Cir. 2006). This Project incorporates mitigation measures throughout the plan of action and the FTA was therefore entitled to rely on them. *Id*. at 1015-1017 (citing the CEQ's "Forty Questions" memorandum).

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 18
(Case No. C13-1004TSZ)

490 U.S. 332, 352 (1989).  Rather, as recognized in *Robertson*, "[t]here is a fundamental

distinction . . . between a requirement that mitigation be discussed in sufficient detail to ensure that

environmental consequences have been fairly evaluated, on the one hand, and a substantive

requirement that a complete mitigation plan be actually formulated and adopted, on the other."  *Id.*

A valid mitigation plan may be merely conceptual.  *See, City of Carmel By The Sea v. U.S. Dept. of*

*Transportation, supra*, 123 F.3d at 1154.  And it is only necessary that an agency discuss mitigation

measures to "a reasonable degree."  *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473

(9th Cir. 2000) (general discussion of mitigation complied with NEPA's "hard look" requirement).

The goal of such a plan is not to set forth binding requirements.  That would be inconsistent with the

purpose of NEPA which is only to provide information as to environmental impacts, including the

extent to which environmental impacts can be mitigated.  *See, Robertson, supra*, 490 U.S. at 332.

Thus, "reasonableness" is assessed by reference to NEPA's objective of allowing the agency and

other interested persons to "properly evaluate the severity of the adverse effects."  *Id.*

Nevertheless, relying on a view which insists upon "concrete" and "enforceable" mitigation

measures, Plaintiffs contend that LTD's commitments regarding measures to compensate for losses

of off-street parking are not sufficiently concrete.  Dkt. # 29, p. 20, *ll.* 1-5.  Of the 951 parking

spaces adjacent to the alignment, the project could affect 72 spaces.  AR0119067.  Nowhere do

Plaintiffs provide any support for their implied argument that the *unmitigated* affect on a small

number of parking spaces is a "significant environmental impact," much less one which would

necessitates that that this project be stopped.  Such an argument simply cannot withstand scrutiny

under the rule of reason.  And the expected *mitigated* loss of off-street parking is minute.  As the EA

states, "many of the affected off-street parking spaces could be maintained by restriping, shifting or

relocating the affected spaces. … Through the mitigation methods listed below, the number of

permanently removed parking spaces could be reduced to as few as 18."  AR00119067.  As to

"enforceability," FTA's FONSI specifically declares that any funding agreement will require LTD to

implement the mitigation measures, AR0115284, and with respect to property acquisitions,

mitigation is required by state and Federal law: "LTD would pay fair market value to property

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 19
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

owners for its acquisition of off-street parking spaces (and all acquired property), consistent with state and federal law," AR0119068.

Similarly, Plaintiffs represent that "the EA relies on mitigation to conclude that [noise and vibration] impacts [from construction] will not be significant," dkt. # 29, p. 20, *ll.* 6-11, but nowhere in the EA is any statement made that unmitigated noise and vibration impacts from construction of the project are expected to be "significant." Rather, the EA describes these impacts as "temporary" and potentially approaching, but not yet reaching, "annoying." AR0118945.[13] The EA describes a set of best practices that will be put in place to minimize equipment-related noise across the board. AR0118946. Moreover, because the potential annoyance caused by construction-related noise and vibration tends to be episodic, localized, and varying according to the sensitivity of the individual, the EA envisions that a "construction communications liaison" will be used to assist in resolving complaints and who will be empowered to implement measures to address the complaints. *Id.* LTD has also committed itself to the implementation of these measures. AR0115284, AR0115163, AR0115287- AR0115288.

The EA also discusses a potential design challenge noting that where new proposed bike and pedestrian structures will cross the Amazon Channel, "localized slope impacts to the Channel banks" could occur with improper design. AR0118978. LTD commits itself to using "appropriate design that considers and responds to subsurface conditions based on a project geotechnical study prepared by a qualifying geotechnical experts." AR0115291. Nowhere in the EA is this particular design challenge, if *unmitigated*, described as a significant environmental impact. In any event, a commitment to geotechnically design a structure so as to properly address a localized slope impact is sufficient for purposes of NEPA. *See, Bergen County v. Dole*, 620 F.Supp. 1009, 1061 (D.N.J. 1985*), aff'd*., 800 F.2d 1130 (3rd Cir. 1986) (environmental process in the case of a highway project was a continuing one and in regards to wetlands impacts mitigation a general commitment to future action was sufficient.)

13 Continuous vibration levels above the range of 0.64 inches per second are regarded by the Department of Transportation to be annoying to people and potentially disruptive in normal working or living environments. AR0068626; AR0068627. A Noise Technical Report prepared for this project predicts vibration levels not to exceed 0.5 inches in any area adjacent to construction sites. AR0068707.

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 20 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

Finally, Plaintiffs contend that the EA "fails to provide any specifics or make any clear commitments" regarding the mitigation of impacts to the cumulatively small area (0.048 acres) of wetlands which may be affected by the project. Dkt. # 29, p. 20, *ll*. 18-22. Assuming arguendo that *unmitigated* impacts on the small isolated areas of wetlands affected by this project would otherwise constitute a significant impact from the project, the assertion that the EA is devoid of specifics concerning measures to mitigate these impacts is not accurate. *See* AR0118996. LTD has specifically committed itself to these mitigation measures. AR0115294- AR0115295. Moreover, it should also be noted that LTD's actions *vis-a-vis* wetlands will be under the direct regulatory authority of, *inter alia*, the U.S. Army Corps of Engineers pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344. *City of Carmel-By-The-Sea, supra,* 123 F.3d at 1152. The Corps has the authority to require the taking of specific mitigation measures as a condition of any Section 404 permit it issues, *see, e.g., Butte Environmental Council v. U.S. Army Corps of Engineers,* 620 F.3d 936, 946-947 (9th Cir. 2010), and the FONSI obligates LTD to "comply with Corps of Engineers permitting requirements …." AR0115294. That fact alone should allay any concerns about whether mitigation of affects to wetlands will be undertaken. *See, City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 1994 WL 190839, *12 (N.D. Cal. 1994), *aff'd. in part and rev'd. in part on other grounds*, 123 F.3d 1142 (9th Cir. 1997) (any concerns about EIS mitigation plan allayed because of U.S. Army Corps of Engineers requirements for mitigation plan in connection with permitting).

In summary, nothing in Plaintiffs' arguments concerning the EA's discussion of mitigation measures demonstrates that the FTA failed to take a sufficiently "hard look" at the impacts associated with the West Eugene EmX project before issuing its FONSI.

## IV. THE EA DOES NOT OVERLOOK ANY POTENTIALLY SIGNIFICANT ENVIRONMENTAL IMPACTS

Plaintiffs contend that the EA "does not give adequate attention to other effects with the potential to be significant." Dkt. # 29, p. 21, *ll*. 1-3. The "inadequately addressed" impacts concern the Project's effects on traffic, the "foreseeable impacts of expected nodal development," and the proportional effects on minority populations." Even if Plaintiffs were correct in these assumptions

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 21
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

1 (and they are not) their arguments fail to demonstrate that federal defendants' conclusion that there

2 are no significant environmental impacts associated with this project was arbitrary and capricious.

3       Plaintiffs' memorandum posits a variety of changes in traffic patterns and truck freight flow

4 that will result from the West Eugene EmX project. According to Plaintiffs, the EA fails to "provide

5 an adequate analysis of how the removal of general purpose lanes on West 6th and West 7th Avenues

6 will impact traffic generally, and heavy vehicle traffic in particular." Dkt. # 29, p. 17, *ll.* 1-3.

7 Clearly, traffic issues received careful and detailed study in the preparation of the EA, *see, e.g.,*

8 AR0125056-AR0125124; AR0125125- AR0125597; AR0126632-AR,0126656; AR0126657-

9 AR0126714, and an entire chapter of the EA entitled "Transportation Facilities" is devoted to these

10 issues, *see* AR0119040- AR0119084. In general, the project is predicted to improve transit travel

11 times and reliability, AR0119062, increase transit ridership, AR0119064, and improve traffic flow

12 and, thus, freight movement, AR0119073. Plaintiffs suggest, based on the opinion of their own

13 expert, that these conclusions "lack a reasonable foundation," dkt. # 29, p. 21, *ll.* 21-23, and this

14 expert proceeds to describe how apparently he or she would conceptually analyze the issues

15 differently, *id.* at p. 17, *l.* 22 – p. 19, *l.* 1. That, however, is not sufficient to establish arbitrariness.

16 *Friends of Endangered Species, Inc., v. Jantzen*, 760 F.2d 976, 986 (9th Cir.1985) (NEPA does not

17 require federal courts to resolve disagreements among experts as to methodology).

18       More to the point, Plaintiffs' argument, while it disputes the integrity of the traffic analysis

19 relied upon in the EA, and expresses a concern that the project may exacerbate rather than mitigate

20 traffic flow issues in the relevant corridor, fails to tie those concerns back to any particular

21 environmental impacts resulting therefrom, *e.g.,* noise, air quality, wetlands impact, endangered

22 species impact, etc. *See, e.g., Fortress Bible Church v. Feiner,* 694 F.3d 208, 217-218 (2nd Cir.

23 2012) (distinguishing between traffic as a standard land use issue as opposed to an environmental

24 concern). As set forth in the EA, it is projected that the West Eugene EmX project will induce

25 people to leave their automobiles and use transit, thereby helping to reduce congested traffic

26 conditions. AR0119079. Even Plaintiffs do not suggest that the project will result in *increased*

27 traffic volumes, and there is otherwise nothing in Plaintiffs' memorandum to suggest that any of the

28 potential traffic flow issues which are of a concern to them either constitute or will result in a

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 22
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

heretofore unrecognized *environmental* impact resulting from the project, much less one of significance.

Plaintiffs also fault defendants for failing to assess the indirect and cumulative effects of the project. Dkt. # 29, p. 23, *ll.* 1-12. This argument rests on the contention that, insofar as the West Eugene EmX is consistent with "nodal development" in this transportation corridor, it is *inconsistent* with local land use planning and will have an adverse impact on industrial land uses. *Id.* at p. 23, *l.* 13 – p. 24, *l.* 11.[14] This argument relies on a technical review of the draft EA by CSA Planning, Ltd., at plaintiff OMOT's request. *See* AR0079504-AR0079511. Nowhere in the CSA review of the EA is there any indication that the author read or considered the lengthy study of the effects of the various project alternatives and design options on existing and future land use which supports the conclusions in the EA. *See* AR0123656-AR0123741 ("Land Use and Prime Farmlands Technical Report"). The build options analyzed in the West Eugene EmX project were found to be wholly consistent with all applicable land use plans and policies. *See, e.g.,* AR0123730. And, notwithstanding Plaintiffs' representation to the contrary, this report demonstrates that the project will serve numerous potential nodal areas in the corridor. AR0123691-AR0123695. Direct impacts, indirect impacts, and cumulative impacts were all analyzed, AR0123715-AR0123727. No potentially significant impacts were identified. Moreover, the consistency of the project with regional, state, and local land use plans in the study area was noted. AR0123718.

Nothing in the record supports Plaintiffs' speculative assertion that the West Eugene EmX project might have a significantly adverse impact on industrial land use in the transportation corridor. And, where as here, a project "conforms to existing land use patterns, zoning, or local plans, such conformity is evidence supporting a finding of no significant impact." *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 861 (9th Cir. 1982).

If the land use trends occur as predicted by OMOT's consultant, the West Eugene EmX will not be the cause of them. These losses of industrial land will occur because that is apparently what the local planning authorities want to occur. The Bus Rapid Transit service ushered in by the West

---

14 Although Plaintiffs use the term "cumulative impacts," they do not identify any past, present or reasonably foreseeable future actions that defendants failed to identify and analyze. *See* 40 C.F.R. § 1508.7. Instead, Plaintiffs seem to be arguing only that defendants did not adequately analyze indirect effects. *See* 40 C.F.R. § 1508.8(b).

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 23
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

Eugene EmX will serve the nodal development concept, but not cause land use changes to occur, and any causal connection between the implementation of the West Eugene EmX and a future loss of industrial land because of nodal development is far too speculative and attenuated to be classified as an indirect effect which must be evaluated in an EA. *See, Center for Environmental Law and Policy v. U.S. Bureau of Reclamation,* 655 F.3d 1000, 1011-1012 (9th Cir. 2011).

Lastly, relying on Executive Order 12898, Plaintiffs contend that the EA inadequately analyzes the disproportionate effects of the project on minority populations. Dkt. # 29, p. 24, *l.* 12 – p. 25, *l.* 11. In making this argument, Plaintiffs are in the difficult posture of using the interests of third parties not before the Court to advance their own ends when those two things may be in conflict. *See Hong Kong Supermarket v. Kizer,* 830 F.2d 1078, (9th Cir. 1987) (vendor lacked standing to assert the interests of WIC program beneficiaries when relief sought would result in the beneficiaries' loss of WIC benefits). While Plaintiffs may wish to enjoin the project, the EA shows that the minority population in the area will greatly benefit from the West Eugene EmX. That problem aside, the Court of Appeals in a NEPA case has refused to entertain an argument that an EIS was defective because it inadequately carried out the requirements of EO 12898. *See, Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1988) (EO 12898 is an internal directive which does not create any right to judicial review for compliance or non-compliance with its provisions).

In any event, *if* the adequacy of the EA's discussion of environmental justice concerns is reviewable in the context of NEPA, it is only insofar as those concerns bear on the question of whether the FTA's finding of no significant environmental impact was arbitrary and capricious. Plaintiffs posit, without a citation to any authority, that "[a] meaningful analysis of impacts to minority populations require comparisons of proportionate impact between minority populations and the populations as a whole." Dkt. # 29, p. 21, *ll.* 7-8. The standards that actually guide the FTA are set forth in Department of Transportation Order 5610.2(a): Actions to Address Environmental Justice in Minority Populations and Low-Income Populations 2012, and those are summarized in the FONSI. AR0115163. Applying those standards, the FTA found that:

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 24 (Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970

LTD analyzed environmental justice as part of the EA. The analysis indicates that in the long term, the proposed project will likely have beneficial effects on minority and low-income populations by providing improved access opportunities to transit, with shorter headways and access to a regional connected BRT system. Any temporary adverse effects on minority and low-income populations will not be appreciably more severe or greater in magnitude than effects experienced by other populations. Based on that analysis, FTA finds that the construction and operation of the West Eugene EmX Extension Project will not result in disproportionately high and adverse effects on low-income or minority populations, and that meaningful opportunities for public involvement by members of these populations were provided during project planning and development.

AR0115163-AR0115164. This finding is based on the EA and on conclusions reached based on data compiled and analyzed in reaching those conclusions. See AR0121460-AR0121525 ("Report on Community Involvement, Agency Coordination, Tribal Consultation, and Environmental Justice").[15]

The "Socioeconomics and Environmental Justice Technical Report," AR0126369 – AR0126610, discusses in detail the methods used to collect and analyze environmental justice population data. *See, e.g.,* AR0126449-AR0126451. Aside from the argument of counsel, there is nothing in Plaintiffs' memorandum to suggest that the methodology employed to evaluate environmental justice concerns was lacking in any way.

## V. PLAINTIFFS HAVE NOT SHOWN ANY ENTITLEMENT TO THEIR REQUESTED REMEDY

Plaintiffs pray for a remedy whereby the Court would set aside the FONSI and enjoin federal defendants and LTD from moving forward with the project. No arguments are advanced in their memorandum to justify such relief. Suffice it to say that even if Plaintiffs' arguments prevail they are not automatically entitled to either remedy. Vacatur of an administrative decision is by no means a given. *See Humane Society of U.S. v. Locke*, 626 F.3d 1040, 1053 (9th Cir. 2010). And an injunction does not follow from success on the merits as a matter of course. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 32 (2008). So far, plaintiffs have failed to show any entitlement to the relief they seek.

---

15 In summary, the conclusion of this report was as follows:

The study area has a greater proportion of low-income people and minorities than does the Eugene-Springfield PO. However, the LP A is not expected to have disproportionately high and adverse human health or environmental effects on these populations. The LP A would provide improved access opportunities to transit, with shorter headways and access to a regional connected BRT system. Potential EJ communities would likely receive greater benefit than other people from improved transit access to jobs and services.

AR0121464; and see, AR0121518.

**CONCLUSION**

For the foregoing reasons, defendants Federal Transit Administration, Peter M. Rogoff, and Richard F. Krochalis, respectfully request that Plaintiffs' motion for summary judgment be denied, federal defendants' cross-motion for summary judgment be granted, and a judgment of dismissal on the merit be entered.

DATED this 28th day of February, 2014.

Respectfully submitted,

JENNY A. DURKAN
United States Attorney

*s/ Brian C. Kipnis*
BRIAN C. KIPNIS
Assistant United States Attorney
Office of the United States Attorney
5220 United States Courthouse
700 Stewart Street
Seattle, Washington 98101-1271
Phone: 206-553-7970
E-mail: brian.kipnis@usdoj.gov

Attorneys for Federal Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Western District of Washington and is a person of such age and discretion as to be competent to serve papers;

It is further certified that on February 28, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participant(s):

Jay C. Johnson
Jcjohnson@venable.com

Kathryn Kusske Floyd
Kkfloyd@venable.com

Margaret K. Kuhn
Mkkuhn@venable.com

Kristina Silja Bennard
Kbennard@yarmuth.com

Louis A. Santiago
Serve.Las@hklaw.com

Dated this 28th day of February, 2014.

_s/ Christine Leininger_
CHRISTINE LEININGER
Supervisory Legal Assistant
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-7970
Fax: 206-553-4067
E-mail: christine.leininger@usdoj.gov

FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, etc. - 27
(Case No. C13-1004TSZ)

UNITED STATES ATTORNEY
5220 UNITED STATES COURTHOUSE
700 Stewart Street
Seattle, Washington 98101-1271
(206)-553-7970