1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

OUR MONEY OUR TRANSIT, and
ROBERT MACHERIONE,

          Plaintiffs,

    v.

FEDERAL TRANSIT
ADMINISTRATION; PETER M.
ROGOFF, in his official capacity as
Administrator, Federal Transit
Administration; and RICHARD F.
KROCHALIS, in his official capacity
as Regional Administrator, Federal
Transit Administration Region X
Office,

          Defendants.

C13-1004 TSZ

ORDER

      This case involves a transit project in Eugene, Oregon.  Plaintiffs Our Money Our

Transit ("OMOT") and Robert Macherione have brought this suit to challenge the

project, the West Eugene Emerald Express ("WEEE"), which is designed to extend

Eugene's Bus Rapid Transit ("BRT") system into West Eugene, linking West Eugene

with the two existing BRT routes in Eugene and Springfield, Oregon.  Defendants are the

ORDER - 1

Federal Transit Administration ("FTA"), the lead federal agency involved in the project, and Lane Transit District ("LTD"), the local transit authority supporting the project. Plaintiffs allege that Defendants violated the National Environmental Policy Act ("NEPA") by failing to adequately assess and disclose the environmental impacts of the WEEE.

Pending before the Court are Plaintiffs' motion for summary judgment, docket no. 29, LTD's cross-motion for summary judgment, docket no. 32, and FTA's cross-motion for summary judgment, docket no. 35. Having considered the motions, and all briefs filed in support of and opposition thereto, the Court GRANTS LTD's and FTA's motions for summary judgment and DENIES Plaintiffs' motion for summary judgment. Defendants engaged in a thorough, detailed, multi-step evaluation of the WEEE project, providing opportunities for public comment through each stage of the process, from defining the purpose of the project to selecting the proposed route. Defendants' analysis resulted in an Environmental Assessment document totaling over 370 pages. Far from being arbitrary or capricious, Defendants' approach to the WEEE project reflects careful, reasoned deliberation and did not violate NEPA. This Order explains the Court's reasoning.

**Background**

The background facts are not in dispute. The WEEE project was initially proposed by LTD and the Eugene City Council in 2007. Between 2007 and 2013, LTD went through a multi-stage review process to identify and evaluate various alternative routes and systems. In March, 2008, LTD adopted the Purpose and Need Statement for

the WEEE, which provides in part: "The Purpose of the proposed WEEE project is to implement high-capacity public transportation service, in the West 11th Corridor (east/west), utilizing the adopted high-capacity transit mode identified in the Regional Transportation plan, that is less hindered by congestion and that provides efficient, effective, dependable, and visually appealing service throughout the life of the project." See Administrative Record ("AR") 118850.

Between 2008 and 2010, LTD evaluated and eliminated dozens of alternatives. This process involved community workshops and public outreach events and consultations with various federal and state agencies. In 2010, LTD completed a technical review of 58 alternatives, including a No-Build alternative, a Transportation System Management ("TSM") alternative,[1] and three BRT alternatives with a total of 56 routing combinations. AR 118831; see Figure 2.3, AR 118866 (WEEE BRT Alternatives Considered in Technical Studies). LTD eliminated 46 of the BRT routing combinations and advanced the remaining alternatives for further consideration in a detailed Alternatives Analysis ("AA") Report. AR 118864-65.

The AA Report concluded that the West 13th Avenue-West 11th Avenue route ("West 13th route") performed best and was recommended for selection as the Locally Preferred Alternative ("LPA"). AR 118342-43. The West 6th/7th Avenue-West 11th

---

[1] Transportation System Management refers generally to enhancing existing bus service without infrastructure improvements.

ORDER - 3

1   Avenue alternative ("West 6th/7th route") ranked second.[2]  Id.  The Joint LPA

2   Committee, a group of local decision-makers tasked with assisting LTD in selecting the

3   LPA, preliminarily recommended the West 13th route as the LPA.  AR 117983.

4   Following the preliminary recommendation, LTD considered numerous comments on the

5   proposed alternatives.  See AR 117992.  The majority of public testimony was opposed to

6   the West 13th route, or opposed to the project in general.  AR 117983.  Following public

7   comments, the Joint LPA Committee sent both the West 13th and the West 6th/7th routes

8   forward for further consideration.  Id.  Ultimately, the three decision-making bodies, the

9   Eugene City Council, the Metropolitan Policy Committee, and the LTD Board, voted to

10  select a mitigated West 6th/7th route as the LPA.  AR 117986-87.[3]

11        FTA determined that environmental review of the modified route alternative could

12  be accomplished with an Environmental Assessment ("EA"), AR 118748, as opposed to a

13  more detailed Environmental Impact Statement ("EIS").  For any major federal action

14  "significantly affecting the quality of the human environment," NEPA requires a federal

15  agency to prepare a detailed statement on the environmental impact of the proposed

16  action, 42 U.S.C. § 4332(C), commonly known as an EIS.  An agency may first prepare a

17  less-detailed EA to analyze whether an action will have a significant impact, which will

18

19  [2] The difference in the total ratings between the West 6th/7th route and the West 13th route was largely
20  due to the number of property acquisitions, higher number of trees removed and potential conflicts with
    the BRT system plan.  AR 118343.

21  [3] Each decision-making body held multiple meetings during the selection phases discussing the WEEE
    and allowing for public comments.  The Eugene City Council held four meetings, the Metropolitan Policy
22  Committee held five meetings including a special public hearing, and the LTD Board held ten meetings.
    AR 117986-87.

23

help the agency determine whether to prepare an EIS or a finding of no significant impact ("FONSI").  40 C.F.R. § 1501.4(b).  An EA is a concise public document that must "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  Id. § 1508.9.

The EA analyzed two alternatives, a No-Build alternative and the West 6th/7th route LPA, and concluded that the project was not expected to cause significant adverse effects.  AR 118832.  The EA was made available for public review and comment, and the agencies received over 1,500 comments on the EA.  FTA evaluated the adequacy of the EA and made a FONSI, concluding that the WEEE would have only short-term construction impacts which were capable of being mitigated.  AR 115163.

The heart of Plaintiffs' argument is that the EA was inadequate and did not support FTA's conclusion that the WEEE will not have a significant impact on the environment.  Plaintiffs claim that Defendants violated NEPA in four primary ways: (1) failing to include the West 13th route alternative in the EA; (2) crafting an impermissibly narrow statement of purpose and need; (3) failing to provide sufficiently detailed mitigation measures; and (4) failing to fully consider all possible impacts.

**Discussion**

  **A.  Standing**

As an initial matter, the Court must address the issue of standing.  LTD argues that Plaintiffs lack both Article III constitutional standing and prudential standing to bring the NEPA claims at issue.

1    To satisfy the requirements of constitutional standing, a plaintiff must show: (1)

2    that it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual

3    or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the

4    challenged action of the defendant; and (3) that it is likely, as opposed to merely

5    speculative, that the injury will be redressed by a favorable decision.  Lujan v. Defenders

6    of Wildlife, 504 U.S. 555, 560-561 (1992).

7    To satisfy the requirements of prudential standing, a plaintiff must show that the

8    interest sought to be protected is within the zone of interests to be protected or regulated

9    by the statute in question.  Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 940 (9th

10   Cir. 2005).  The zone of interests NEPA protects is environmental, and purely economic

11   interests do not fall within NEPA's zone of interests.  Id.

12   Here, LTD argues that Plaintiffs lack constitutional standing because Plaintiffs

13   have not suffered an injury in fact and because any alleged injuries are not redressable.

14   LTD also argues that Plaintiffs lack prudential standing because Plaintiffs' interests are

15   non-environmental.

16   For constitutional standing, a plaintiff must allege injury to himself and need not

17   show injury to the environment.  Cantrell v. City of Long Beach, 241 F.3d 674, 682 (9th

18   Cir. 2001).  Plaintiff Macherione has alleged concrete, imminent injury that he will suffer

19   if construction on the WEEE project moves forward as planned, including among other

20   things aggravation of his asthma due to generation of dust and pollutants, increased noise,

21   and loss of trees which he enjoys daily.  See Macherione Decl., docket no. 40, at ¶¶ 11-

22   16.  Plaintiff's injury is redressable, because a favorable decision would require

23

ORDER - 6

1  Defendants to complete additional analysis under NEPA.  Plaintiffs "need not

2  demonstrate that the ultimate outcome following proper procedures will benefit them."

3  Cantrell, 241 F.3d at 682.  Plaintiffs seeking to enforce a procedural right under NEPA to

4  protect their concrete interests have standing to challenge the adequacy of the EA, even

5  though they cannot establish that a revised EA would result in a different alternative.  Id.

6     Furthermore, the interests Plaintiff Macherione seeks to protect fall within the

7  zone of interests NEPA is designed to protect.  Although Plaintiffs also have economic

8  interests and assert that the WEEE project is a "waste of money," Macherione Decl. at

9  ¶ 7, Plaintiff Macherione has alleged environmental interests sufficient to satisfy the

10 requirement of prudential standing.

11    LTD raises serious questions regarding whether OMOT has organizational

12 standing, arguing that OMOT is primarily concerned with expenditure of tax dollars and

13 not with the environment.  However, having concluded that Plaintiff Macherione has

14 standing, the Court need not consider whether OMOT has standing.  See Clinton v. City

15 of New York, 524 U.S. 417, 431 n.19 (1998).  See also Nat'l Ass'n of Optometrists &

16 Opticians LensCrafters v. Brown, 567 F.3d 521, 523 (9th Cir. 2009) ("As a general rule,

17 in an injunctive case this court need not address standing of each plaintiff if it concludes

18 that one plaintiff has standing.").

19 **B.  Administrative Procedure Act Standard of Review**

20    NEPA does not provide for a private right of action, therefore plaintiffs

21 challenging an agency action based on NEPA must do so under the Administrative

22 Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq.  Ashley Creek Phosphate Co. v. Norton,

23

1   420 F.3d 934, 939 (9th Cir. 2005).  Under the APA, the Court may set aside an agency

2   action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in

3   accordance with law."  5 U.S.C. § 706.

4   **C. National Environmental Policy Act Claims**

5          NEPA is the "basic national charter for protection of the environment" and it

6   "contains 'action-forcing' provisions to make sure that federal agencies act according to

7   the letter and spirit of the Act."  40 C.F.R. § 1500.1(a).  Following NEPA procedures

8   ensures that "environmental information is available to public officials and citizens

9   before decisions are made and before actions are taken."  Id. § 1500.1(b).  "The NEPA

10  process is intended to help public officials make decisions that are based on

11  understanding of environmental consequences, and take actions that protect, restore, and

12  enhance the environment."  Id. § 1500.1(c).  NEPA only requires that agencies take a

13  hard look at environmental consequences; it does not mandate any particular result and

14  "merely prohibits uninformed -- rather than unwise -- agency action."  Robertson v.

15  Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).  The Court must not

16  substitute its judgment for that of the agency concerning the prudence of a proposed

17  action, and once the Court is satisfied that the agency has taken a hard look at a

18  decision's environmental consequences, the Court's review is at an end.  City of Carmel-

19  by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1151 (9th Cir. 1997).

20

21

22          **a.  Failure to Include West 13th Route**

23

ORDER - 8

1    Plaintiffs argue that Defendants violated NEPA by failing to include the West 13th

2    route as part of the EA's alternative analysis.

3    Although an agency must "give full and meaningful consideration to all

4    reasonable alternatives" in an EA, and the "existence of a viable but unexamined

5    alternative renders an EA inadequate," Western Watersheds Project v. Abbey, 719 F.3d

6    1035, 1050 (9th Cir. 2013) (citations and quotation omitted), an agency is not required to

7    include every possible alternative in an EA.  "Judicial review of the range of alternatives

8    considered by an agency is governed by a 'rule of reason' that requires an agency to set

9    forth only those alternatives necessary to permit a 'reasoned choice.'"

10   Honolulutraffic.com v. Fed. Transit Admin., 742 F.3d 1222, 1231 (9th Cir. 2014)

11   (quoting State of Cal. v. Block, 690 F.2d 753, 767 (9th Cir. 1982)).  "An agency is under

12   no obligation to consider every possible alternative to a proposed action, nor must it

13   consider alternatives that are unlikely to be implemented or those inconsistent with its

14   basic policy objectives."  Id. (quoting Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401,

15   1404 (9th Cir. 1996)).  Furthermore, "an agency does not violate NEPA by refusing to

16   discuss alternatives already rejected in prior state studies."  Id.  A state-prepared AA

17   "may be used as part of the NEPA process as long as it meets certain requirements,

18   including that (1) the federal lead agency furnished guidance in the AA's preparation and

19   independently evaluated the document, 23 U.S.C. § 139(c)(3), and (2) the AA was

20   conducted with public review and a reasonable opportunity to comment, 23 C.F.R.

21   § 450.318(b)(2)(ii)-(iii)."  Id.

22   Plaintiffs, relying on Abbey, argue that the West 13th route was a viable

23

ORDER - 9

alternative that was not analyzed in the EA, rendering the EA inadequate.  However, Abbey is distinguishable.  In Abbey, which involved grazing rights, the court held that the agency failed to take a hard look at the environmental impacts in an EA relating to the Woodhawk Allotment because each of the four considered alternatives would authorize grazing at the exact same level, with distinctions only between various terms and conditions.  Abbey, 719 F.3d at 1051 ("There is no meaningful difference between the four alternatives considered in detail as to how much grazing they allow").  The court held that failure to consider an alternative involving reduced grazing levels, which could have met the project's purpose, rendered the EA process deficient.  Id. at 1053.  In contrast, the EA in this case considered two meaningfully different alternatives, a No-Build alternative and the 6th/7th route LPA.

Furthermore, in Abbey, reduced grazing levels had not been legitimately considered as an alternative.  The EA simply stated that no-grazing or reduced-grazing alternatives (1) were rejected as beyond the purpose and need of the project and (2) need not be considered because a no-grazing alternative had been analyzed almost thirty years earlier.  Id. at 1051.  The court rejected both of these arguments.  Id.  Here, the record is clear that the West 13th route was considered at length in the process leading up to the EA.

This case is more closely analogous to Honolulutraffic.com, where plaintiff interest groups and individuals brought suit to challenge a high-speed rail project in Honolulu, Hawaii.  Honolulutraffic.com, 742 F.3d at 1225.  The project was the result of a long-range and multi-step planning effort over several years by local and federal

1   agencies.  Id. at 1225-26.  The City of Honolulu identified the project's purpose and

2   need, prepared an Alternative Analysis ("AA"),[4] and selected a Fixed Guideway elevated

3   rail system as the LPA.  Id. at 1226.  The City and FTA then prepared an EIS, evaluating

4   a No Build option and three alternatives, stating that other alternatives had been

5   eliminated because the Fixed Guideway best met the project's purpose and need and had

6   been selected as the LPA.  Id.  Plaintiffs alleged that the defendants violated NEPA by

7   failing to consider all reasonable alternatives, contending that the EIS should have

8   considered alternatives the state had earlier rejected.  Id. at 1230-31.  The court held that

9   the defendants properly relied on the City-prepared AA process to eliminate alternatives.

10  Id. at 1232.

11          In this case, it is undisputed that the West 13th route is a viable alternative to the

12  LPA.  Although Plaintiffs emphasize the idea that the shortest distance between two

13  points is a straight line, and the West 13th route is clearly a straighter line, this argument

14  is irrelevant under NEPA.  It is not a concern which route is straighter or shorter, except

15  to the extent that the difference between the routes has an environmental impact.

16          The West 13th route was thoroughly examined in the AA and the public was

17  provided an opportunity to comment on the project and the proposed route.  It was after

18  receiving public comments that the local decision-making bodies ultimately rejected the

19  West 13th route and selected the mitigated West 6th/7th route as the LPA.  Furthermore,

20  it is clear from the record that FTA furnished guidance to LTD in the AA's preparation,

21

22  [4] An AA is required for federal funding under the Department of Transportation's New Starts Program.
    See 49 U.S.C. § 5309.  LTD completed the AA in this case.

23

ORDER - 11

AR 113576-77 (letter from FTA to LTD titled "FTA Alternatives Analysis Guidance for the [WEEE] Project"), and independently evaluated the document, AR 114557-558.  The West 13th route was not "unexamined."  Rather, it was considered and excluded during the environmental review process, and the EA discusses the existence of the alternative and states that it was rejected by the decision-making bodies.  AR 118869.  Defendants were not obligated under NEPA to re-examine this or other previously rejected alternatives.

Furthermore, the standard for consideration of alternatives is less rigorous for an EA than for an EIS.  Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005).  NEPA does not dictate a minimum number of alternatives that must be considered, and therefore it is generally sufficient for an agency to consider only a No Build and a preferred alternative, especially where the proposed project does not result in significant environmental effects.  Earth Island Inst. v. United States Forest Serv., 697 F.3d 1010, 1022 (9th Cir. 2012).[5]  Here, Defendants included a No Build alternative and the West 6th/7th route LPA in the EA and concluded that the LPA will result in no significant environmental effects.  Defendants were not obligated to consider additional routing options and alternatives to fulfill their obligations under NEPA.

### b.  Purpose and Need Statement

---

[5] As noted by the court in Earth Island Institute, since deciding an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS, "we are aware of no Ninth Circuit case where an EA was found arbitrary and capricious when it considered both a no-action and preferred action alternative."  697 F.3d at 1022.  Plaintiffs in the case before this Court provide no cite to any Ninth Circuit case where an EA was found to be arbitrary and unreasonable under these circumstances, and the facts of this case do not lead the Court to conclude it should be so.

1    Plaintiffs argue that Defendants crafted an impermissibly narrow Purpose and

2  Need Statement, resulting in the exclusion of the otherwise reasonable TSM alternative.

3  An agency enjoys considerable discretion in defining the purpose and need of a project,

4  and the Court will evaluate the statement of purpose under a reasonableness standard.

5  Nat'l Parks & Conservation Ass'n v. BLM, 606 F.3d 1058, 1070 (9th Cir. 2010).

6  However, an agency may not define a project's objectives in terms so unreasonably

7  narrow that only one alternative would accomplish the goals of the project.

8  Honolulutraffic.com v. Fed. Transit Admin., 742 F.3d 1222, 1230 (9th Cir. 2014).

9    In Honolulutraffic.com, the purpose of the project was stated, in part, as to provide

10 high-capacity rapid transit in the highly congested east-west transportation corridor

11 between Kapolei and University of Hawaii Manoa.  Id. at 1230.  The plaintiffs asserted

12 that this statement of purpose and need was unreasonably narrow.  Id.  The Ninth Circuit

13 disagreed, concluding that the statement of purpose and need was "broad enough to allow

14 the agency to assess various routing options and technologies for a high-capacity, high-

15 speed transit project."  Id. at 1231.

16    Similarly, in Building A Better Bellevue v. U.S. Department of Transportation, the

17 stated purpose of the project was "to expand the Sound Transit Link light rail system …

18 in order to provide a reliable and efficient alternative for moving people throughout the

19 region."  2013 WL 865843 * 1 (W.D. Wash. 2013).  The plaintiffs argued that restricting

20 consideration to light rail instead of other high-capacity transit modes was unreasonable.

21 Id. at * 5.  The Court called the argument "a non-starter," holding that the "decision to

22 confine the purpose of the East Link project to expanding the light rail system was

23

ORDER - 13

1    anything but arbitrary. To the contrary, it was the result of a long, careful, and

2    deliberative process, and the light rail-specific purpose responds precisely to the

3    transportation problems that needed to be solved." Id.

4         Here, the purpose of the WEEE "is to implement high-capacity public

5    transportation service, in the West 11th Corridor (east/west), utilizing the adopted high-

6    capacity transit mode identified in the Regional Transportation plan." This statement,

7    like the one at issue in Honolulutraffic.com, is broad enough to allow for a wide range of

8    alternative routes, and multiple alternative routes were in fact considered throughout the

9    analysis. Furthermore, the decision to restrict the project to high-capacity transit, and

10   specifically to BRT, was the result of a long, careful, deliberative process. The WEEE

11   Purpose and Need Statement is reasonable.

12        **c.  Sufficiently Detailed Mitigation Measures**

13        Plaintiffs argue that the EA does not sufficiently and specifically set forth the

14   mitigation measures necessary to ensure no significant impact.  An agency is not required

15   to develop a complete mitigation plan, but must propose mitigation measures that are

16   developed to a reasonable degree.  National Parks & Conservation Ass'n v. Babbitt, 241

17   F.3d 722, 734 (9th Cir. 2001), abrogated on other grounds by Monsanto Co. v. Geertson

18   Seed Farms, 561 U.S. 139 (2010).  A "mitigation plan need not be legally enforceable,

19   funded or even in final form to comply with NEPA's procedural requirements." National

20   Parks & Conservation Ass'n v. U.S. Dep't of Transp., 222 F.3d 677, 681 (9th Cir. 2000).

21

22        Here, the EA sets forth specific mitigation measures that are sufficiently

23

ORDER - 14

developed to fulfill Defendant's obligations under NEPA.  In Chapter 3 of the EA, titled

Affected Environment and Environmental Consequences, potential impacts in multiple

categories are discussed in detail, with each category including a section on mitigation

measures for those impacts.  AR 118899-119032.  The impacts and mitigation measures

are then summarized in Appendix ES-1.  AR 120213-228.  Mitigation measures are

provided even for impacts not deemed "significant," such as mitigating potential parking

impacts by restriping parking lots where feasible.  Plaintiffs take issue with the EA's use

of qualifying language such as "where feasible" or "where practicable," but these

qualified measures are mitigating impacts not deemed significant.[6]  Where potentially

significant impacts have been identified, the EA includes specific detailed mitigation

measures.[7]  The Court holds that the EA's discussion of mitigation measures is

reasonable and adequately evaluates potential impacts and benefits of the two alternatives

and possible measures to mitigate adverse impacts.

### d.  Consideration of Other Impacts

Plaintiffs also argue that the EA failed to adequately address the WEEE's effects

on transit, nodal development, and minority populations.  These arguments have no merit.

In addition to separate traffic studies, the EA devotes an entire chapter to transportation

[6] See AR 120213 (mitigation measures for non-significant land use impacts); AR 120214 (property acquisition); AR 120216 (socioeconomics and environmental justice); AR 120219 (visual and aesthetic qualities).

[7] See AR 120218 (mitigation measures for noise and vibration impacts); AR 120219 (air quality); AR 120220 (temporary impacts to park and recreation areas); AR 120221 (hazardous materials); AR 120221 (geotechnical and seismic activity); AR 120222 (biological resources and endangered species); AR 120223 (wetlands and waters); AR 120224-25 (water quality and hydrology); AR 120226 (energy and sustainability, street and landscape trees); AR 120228 (transportation).

ORDER - 15

1   effects, including effects on transit and traffic.  <u>See</u> AR 119035-84.  Moreover, although

2   Plaintiffs argue that the EA fails to fully account for impacts to traffic, Plaintiffs do not

3   set forth any possible *environmental* impacts that were potentially overlooked or that

4   would render the EA inadequate for NEPA purposes.  With regard to nodal development,

5   Plaintiff argues that the WEEE conflicts with land use plans, but again sets forth no

6   possible environmental impacts that were not considered in the EA.  Finally, with regard

7   to minority populations, the EA reasonably addresses socioeconomic and environmental

8   justice concerns.  <u>See</u> AR 118922-37.

9   **<u>Conclusion</u>**

10          For the foregoing reasons, the Court holds that Defendants' actions were not

11  arbitrary or capricious and that Defendants did not violate NEPA.  The Court GRANTS

12  LTD's and FTA's motions for summary judgment, docket nos. 32 and 35, and DENIES

13  Plaintiffs' motion for summary judgment, docket no. 29.  This case is DISMISSED with

14  prejudice.

15          IT IS SO ORDERED.

16          Dated this 16th day of July, 2014.

17

18                                          THOMAS S. ZILLY
                                            United States District Judge
19

20

21

22

23

ORDER - 16